| |
|---|
| **Sinclair v Nesa** |
| 2024 NY Slip Op 33629(U) |
| October 10, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 502516/2018 |
| Judge: Consuelo Mallafre Melendez |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 15 of the Supreme Court of
the State of NY, held in and for the County of
Kings, at the Courthouse, at 360 Adams Street,
Brooklyn, New York, on the 10th day of October
2024.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------------X
WALTER G. SINCLAIR and CHRISTOPHER HUGO
SINCLAIR, as Co-Administrators of the Estate of EARL
SINCLAIR, deceased,

     Plaintiffs,

  -against-

MUSHAMMAT J. NESA, M.D., MUSHAMMAT JIBON NESA,
M.D., P.C., SAFWAT F. MOSAD, M.D., SAFWAT F. MOSAD,
M.D., P.C., and NEW YORK CONGREGATIONAL NURSING
HOME,

     Defendants.
-------------------------------------------------------------------------X

**DECISION & ORDER**

 Index No. 502516/2018
 Mo. Seq. 8 & 9

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s: Seq. 8: 145 – 147, 148 – 170, 198 – 199, 200 – 214, 232

       Seq. 9: 171 – 173, 174 – 193, 215 – 216, 217 – 231, 233

Defendants Safwat F. Mosad, M.D. ("Dr. Mosad") and Safwat F. Mosad, M.D. P.C. move (Seq. No. 8) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all causes of action against them, or in the alternative, granting partial summary judgment and dismissing any claim and/or theory of liability as to which there are no issues of fact.

Defendants Mushammat J. Nesa, M.D. ("Dr. Nesa") separately moves (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor.

Plaintiffs oppose both motions.

Earl Sinclair ("Decedent" or "the patient") commenced this action on February 7, 2018, asserting claims of medical malpractice against Dr. Mosad, Dr. Nesa, and non-moving co-defendant New York Congregational Nursing Home ("New York Congregational") in connection with treatment of a pressure ulcer on his right heel.

1

[* 1]

Decedent passed away after the commencement of the action, and Walter G. Sinclair and Christopher Hugo Sinclair were substituted as duly appointed co-administrators of Decedent's estate, pursuant to CPLR 1015 (a), on September 23, 2021.

At the time of the treatment in question, Decedent was 74 years old and had a history of obesity, congestive heart failure, and bilateral swelling in his ankles and feet. He was treated for edema and lower extremity venous insufficiency at non-party SUNY Downstate Medical Center, then discharged to New York Congregational on April 19, 2016 for subacute rehabilitation.

Decedent was treated at New York Congregational from April 19, 2016 to June 11, 2016. Dr. Nesa was the attending physician who directed and signed orders related to his acute medical treatment during that time. Dr. Mosad was the wound care consultant, whose recommendations were implemented by Dr. Nesa and the nursing staff. Upon admission, Decedent had an existing pressure ulcer on his right heel, which was noted on April 20 as a black discoloration consistent with a deep tissue injury.

Dr. Nesa first evaluated the patient on April 22. He noted that Decedent had lower extremity edema which was greater on the right side, and the right foot was discolored and oozing serous fluids.

On April 25, Dr. Mosad first examined Decedent as a wound care specialist and measured his right heel ulcer as an unstageable deep tissue injury, approximately 10 cm x 11 cm. He recommended saline cleansing, heel booties, and triple bandage (cushion layer, sterile stretch gauze, Ace bandage). He also recommended a wound care protocol including turning and positioning every two hours, offloading the right heel ulcer, using pressure-relieving devices, and elevating the legs. This protocol was to be implemented by the nursing staff. Decedent was noted on some occasions as non-compliant with wearing heel booties.

On May 2, Dr. Mosad noted that he discussed "all options including amputation" with Decedent, and Decedent chose to continue conservative treatment. Dr. Mosad testified that the chance of the pressure ulcer healing was poor due to his severe peripheral vascular disease. When Dr. Mosad saw Decedent again on May 6, the size of the pressure ulcer was unchanged and Decedent was still resistant to lower leg amputation.

2

[* 2]

On May 13, Dr. Mosad recommended sharp debridement of the wound. Dr. Nesa ordered a venous doppler ultrasound to rule out deep vein thrombosis, which came back negative.

On May 16, the wound was noted to be necrotic and foul-smelling. Dr. Mosad recommended, and Dr. Nesa ordered, an x-ray which ruled out osteomyelitis. He was prescribed broad spectrum antibiotic Augmentin by Dr. Nesa on May 17.

Following an aseptic debridement by Dr. Mosad on May 20, the wound measured 15 x 17 x 0.4 cm. Dr. Mosad observed that it was now stage IV, and that the lack of blood indicated a complete occlusion of the artery. He reported these findings and the likelihood of amputation to Dr. Nesa. Decedent's wound care treatment and antibiotics continued, with Dr. Nesa extending his course of Augmentin and adding doxycycline on Dr. Mosad's recommendation.

On May 27, Dr. Nesa ordered a vascular surgery consult, which was scheduled for June 8. On June 8, Decedent was seen by the vascular surgeon, who assessed that debridement was unlikely to heal the right heel ulcer and recommended below the knee amputation.

On June 10, Dr. Mosad saw Decedent for the last time. He noted that Decedent still did not agree to amputation, though the foot now had wet gangrene – a bacterial infection combined with obstructed blood flow – and was not responsive to treatment. Dr. Nesa continued antibiotics, wound care ointments, and bandaging.

On June 11, Dr, Nesa transferred Decedent to Kings County Hospital to rule out sepsis in response to abnormal vital signs. Decedent presented to the emergency department with "septic shock and tachycardic from wet gangrene of his right lower extremity." The same day, his right leg was amputated below the knee. During his Kings County Hospital admission, a CT angiography showed moderate to severe stenosis in the right popliteal artery, occlusion of the right posterior tibial artery, and occlusion of the mid anterior tibial artery. He was discharged to Brooklyn Center for Rehabilitation and had no further treatment with Defendants.

Plaintiffs allege that Dr. Nesa and Dr. Mosad departed from the standard of care in treating Decedent's right heel pressure ulcer from April 19, 2016 to June 11, 2016, and that these departures proximately caused

3

[* 3]

Decedent's injuries including the deterioration of his stage IV right heel pressure ulcer, septic shock, gangrene, and right leg below the knee amputation.

As an initial matter, the corporate entity Safwat Mosad, M.D., P.C. moves (Seq. No. 8) for summary judgment on the basis that Decedent was not a private patient of the corporation, and they are not vicariously liable for Dr. Mosad's alleged malpractice. The movants also assert that Dr. Mosad's recommendations and directives at New York Congregational were "implemented and carried out by the co-defendants," none of whom were "affiliated with, or employees of" Dr. Mosad's professional corporation. Of note, in Dr. Mosad's own testimony, he denied having a practice incorporated under his own name (Dr. Mosad deposition tr, at 21-22). Further, the moving papers concede that no one associated or affiliated with the corporation "besides Dr. Mosad" or "other than Dr. Mosad himself" treated Decedent. However, the factual allegation that Safwat Mosad, M.D., P.C. was a duly organized professional corporation was admitted in the defendants' joint answer (Exhibit D).

Generally, a professional service corporation is subject to the same doctrine of *respondeat superior* as any other corporation and is vicariously liable for the torts of employees, agents, and shareholders acting within the scope of the business (*see Keitel v Kurtz,* 54 AD3d 387 [2d Dept 2008]; *Monir v Khandakar,* 30 AD3d 487 [2d Dept 2006]). The movants herein have failed to clarify the relationship of Dr. Mosad to Safwat Mosad, M.D., P.C. or establish *prima facie* that he was not acting as an employee, agent, or shareholder while rendering the treatment at issue to Decedent. Having cited no facts or legal authority to support their motion on this basis as a matter of law, the branch of the motion seeking summary judgment for Safwat Mosad, M.D., P.C. is **denied** as to any vicarious liability claims on Dr. Mosad's behalf.

Turning to the direct claims against Dr. Mosad, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (*Stukas v Streiter,* 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:

"The elements of a medical malpractice cause of action are a deviation or departure from accepted

4

[* 4]

community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted]).

In support of Dr. Mosad's motion (Seq. No. 8), the movants submit an expert affirmation from Cameron R. Hernandez, M.D. ("Dr. Hernandez"), a licensed physician certified in internal medicine and geriatrics, and an expert affirmation from George J. Todd, M.D. ("Dr. Todd"), a licensed physician certified in surgery and vascular surgery, in addition to relevant medical records and deposition transcripts.

Based on the record, Dr. Hernandez opines that Dr. Mosad complied with the standard of care from his first examination of Decedent to the end of his treatment at New York Congregational. Dr. Hernandez opines that the skin ulcer protocols recommended by Dr. Mosad, including pressure relieving devices, elevation, and turning and positioning schedule, were appropriate within the standard of care. He also opines that Dr. Mosad's treatment plan of triple bandaging and cleansing from his initial April 25 evaluation was within good and acceptable practice of wound care.

Dr. Hernandez opines that Dr. Mosad properly monitored the wound for infection, and timely recommended an x-ray to determine whether there was osteomyelitis (infection of the bone) on May 16. He also notes that Dr. Mosad used Dakins solution "to kill germs in the wound" and prevent infection, debrided the wound on May 20, and recommended additional oral antibiotic doxycycline on May 20 "in an abundance of

caution," as Decedent was already being treated with Augmentin. Dr. Hernandez opines these antibiotics were proper. He notes that Decedent never had a fever at this time, which he opines demonstrates that he likely did not have a tissue infection, and the x-ray had ruled out bone infection.

Dr. Hernandez further opines that an infectious disease consult was not warranted, as he was already "being treated as effectively as possible with the appropriate antibiotics, Augmentin and doxycycline" and "he never showed signs and symptoms" such as fever or disorientation.

The expert opines there was no need for a vascular consultation because Decedent had already been seen by a cardiologist and prescribed appropriate medications and he had a known, sufficient diagnosis of peripheral venous insufficiency from SUNY Downstate Medical Center.

With respect to a vascular surgery consultation, Dr. Hernandez notes that Dr. Mosad suggested a vascular surgery referral multiple times beginning on May 2, but Decedent was resistant to considering amputation and did not agree to see one until May 27.

Finally, Dr. Hernandez opines that there was "no need to transfer Mr. Sinclair to another facility . . . for any care other than the amputation of the right lower extremity," stating that he was "not unwell and his only active problem was the wet gangrene at the site of his right heel pressure ulcer." Therefore, he opines that Dr. Mosad did not depart from the standard of care by not referring him to a hospital until he consented to the procedure on June 11.

On the issue of proximate causation, Dr. Hernandez opines that the worsening of his right heel pressure ulcer was unavoidable despite proper treatment. He states that "there were no changes in Mr. Sinclair's condition, other than the progression of his right heel pressure ulcer to wet gangrene, despite the appropriate wound care being recommended by Dr. Mosad" and implemented by New York Congregational staff. He opines that the progression to wet gangrene was an inevitable result of Decedent's "severe peripheral vascular disease" which made him unable to heal the wound and surrounding tissue. He further opines that due to Decedent's peripheral vascular disease, "the ability of any antibiotics to reach the site was unlikely," and despite compliance with the good and accepted practices to prevent the wound from worsening, it was "not

6

[* 6]

receiving sufficient oxygen rich blood to promote healing and healthy tissue." Thus, he concludes that in his opinion, Decedent's wet gangrene was not proximately caused by any departures from the standard of care.

Additionally, Dr. Mosad's vascular surgery expert, Dr. Todd, opines that due to Decedent's "extensive infra-popliteal arterial occlusive disease" and his preexisting right heel pressure ulcer, the eventual amputation six weeks after his admission to New York Congregational was "inevitable." He states based on the Kings County Hospital pathology report, showing severe arterial occlusion in his right lower extremity, that Decedent's right heel pressure ulcer "never had a chance of healing" and amputation was "inevitable to prevent infection which would lead to a septic blood infection and possibly his death." Therefore, he opines that any departures from the standard of wound care by Dr. Mosad did not proximately cause the need for amputation. He also opines that an earlier operation to revascularize his foot would not have been successful, and an earlier vascular consult would not have changed the outcome.

Based on the submissions, Dr. Mosad has established prima facie entitlement to summary judgment on the issues of standard of care and proximate causation, by setting forth expert opinions that Dr. Mosad complied with the applicable standard of care and that different treatment would not have prevented the progression of Decedent's infection and eventual amputation. The burden therefore shifts to Plaintiffs to raise a triable issue of fact.

In opposition, Plaintiff submit an expert affirmation from Nathan Aranson, M.D. ("Dr. Aranson"), a licensed physician certified in surgery and vascular surgery, as well as additional medical records. Dr. Aranson addresses both defendants' motions in his affirmation.

As an initial matter, an expert opinion need not be provided by a specialist, but the expert must demonstrate that they are "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (*DiLorenzo v Zaso,* 148 AD3d 1111, 1112-1113 [2d Dept 2017]; *see also Cerrone v North Shore-Long Is. Jewish Health Sys, Inc.,* 197 AD3d 449 [2d Dept 2021]). The Court finds that vascular specialist Dr. Aranson has sufficiently set forth his qualifications to render

7

[* 7]

opinions on the standard of care for general internal medicine and wound treatment, specifically in the context of a patient with impaired circulation.

Based on the record and his relevant expertise, Dr. Aranson opines that Dr. Mosad departed from the standard of care in treating Decedent's right heel pressure ulcer and these departures proximately caused his claimed injuries. Specifically, Dr. Aranson opines that the standard of care for a heel pressure ulcer is "aggressive offloading of the heels" to keep continued pressure off the area. He counters the Defendants' expert that Dr. Mosad's treatment plan was properly implemented, noting that the patient was known to "decline" and "refuse" to wear heel booties on multiple occasions. Dr. Aranson opines that the importance of offloading pressure to the heels was not sufficiently explained to the patient in accordance with the standard of care.

Dr. Aranson also opines that Dr. Mosad failed to refer Decedent to a hospital as early as May 13, when it was "apparent that the right heel wound was not healing" and the patient "required hospitalization to aggressively treat the wound." Dr. Aranson notes that on May 13, Dr. Mosad recorded the wound had become worse and sharp debridement was needed. However, Dr. Aranson notes that the aseptic debridement was not performed by Dr. Mosad until May 20, a week after this evaluation. Furthermore, Dr. Aranson opines that debridement should have been performed at least two weeks earlier under the standard of care, based on the status of the non-healing wound on his May 2 and May 6 consultations. Dr. Aranson opines that the delay in "necessary debridement" and the delay in transporting Decedent to a hospital if his wound care needs could not be met by New York Congregational staff constituted departures from good and accepted medical practice.

Dr. Aranson counters the opinion of Dr. Mosad's internal medicine expert that Decedent was properly treated for a suspected or active infection. Dr. Aranson opines that Dr. Mosad departed from the standard of care by failing to culture the drainage from the wound on May 16, despite clear signs of infection (odor and serosanguinous drainage). In the expert's opinion, the standard of care required timely treatment of the infection, including a culture to identify the type of bacteria and correct antibiotics. Ultimately a culture on June 8 revealed Morganella bacteria, which the expert notes is resistant to the broad-spectrum antibiotics Augmentin

8

[* 8]

and doxycycline which the patient had been prescribed. Dr. Aranson opines this resulted an 18-day delay in proper antibiotic treatment, allowing the infected wound to deteriorate.

Finally, Dr. Aranson opines that Dr. Mosad failed to adequately evaluate Decedent's arterial circulation, by assessing pulse or temperature of the leg, comparing the blood pressure in the ankle to that of the arm (ankle brachial index), or performing an arterial pulse wave. He opines that the standard of care required these tests to be performed from his earliest evaluation on April 25, when Decedent was known to have a history of blood flow insufficiency which would impact his wound treatment.

On the issue of proximate causation, Dr. Aranson opines that the above delays in proper debridement, arterial circulation tests, appropriate antibiotics, and transport to the hospital "led to the deterioration of the wound and need for amputation." He counters the defendant's expert opinions that the claimed injuries were inevitable, stating that Decedent developed an infection and septic shock requiring transfer to the hospital on June 11, due to the insufficient treatment of the wound. He also counters the opinion that the ultimate outcome of amputation was inevitable, stating that it was simply "too late" by the time a vascular surgeon was consulted on June 8, as the wound had already become infected and gangrenous by that point.

Plaintiffs' expert raises clear issues of fact as to whether Dr. Mosad complied with the standard of care as Decedent's wound care specialist. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (*Stewart v. North Shore University Hospital at Syosset*, 204 AD3d 858, 860 [2d Dept. 2022], citing *Russell v. Garafalo,* 189 A.D.3d 1100, 1102, [2d Dept. 2020]). Here, there is a conflict between the experts on multiple alleged departures from the standard of care, including the timeliness of debridement, proper offloading of the heel, and a wound culture to prescribe appropriate antibiotics.

Plaintiffs' expert also raises issues of fact on proximate causation, with respect to the progression of infection, gangrene, and septic shock, and with respect to the need for amputation. Contrary to the movant's argument in reply, Plaintiffs' vascular expert did not fail to address Decedent's comorbidities or the CT angiogram which revealed, upon his presentation to Kings County Hospital on June 11, that he had complete occlusion of his tibial arteries. Rather, the expert offers a conflicting opinion that the patient's vascular

9

[* 9]

insufficiency could have been diagnosed sooner with proper testing or referral, and the movant's "failure to evaluate the adequacy of arterial circulation in the right leg" deprived Decedent of the chance to avoid amputation. These issues of fact and credibility must be resolved by a jury, and therefore Dr. Mosad's motion for summary judgment is **denied.**

In support of Dr. Nesa's motion (Seq. No. 9), the movant submits an expert affirmation from Mark Steven Lachs, M.D. ("Dr. Lachs"), a licensed physician certified in internal medicine and geriatric medicine, and an expert affirmation from Gary Giangola, M.D. ("Dr. Giangola"), a licensed physician certified in vascular surgery, as well as medical records and deposition transcripts.

Based on the record and his expertise, Dr. Lachs opines that Dr. Nesa acted in accordance with the standard of care as Decedent's primary medical physician at New York Congregational. Dr. Lachs notes that the right heel pressure ulcer was already unstageable at the time he was admitted to the nursing facility, and it did not develop under Dr. Nesa's care. Dr. Lachs opines that in her initial evaluation of the patient on April 22, Dr. Nesa appreciated the deep tissue injury and the patient's medical history. He opines that she appropriately managed the patient's wound care "alongside wound care provider Dr. Mosad," and she entered orders consistent with his treatment recommendations. Dr. Lachs also opines that Dr. Nesa appropriately and timely ordered a venous doppler ultrasound to rule out a blood clot on May 12.

On May 17, Dr. Nesa evaluated the patient for a suspected infection. Dr. Lachs opines that the Augmentin prescribed by Dr. Nesa on that date, followed by the addition of doxycycline on May 20, were appropriate medications under the standard of care. Dr. Lachs opines that it is "proper to start with a broad-spectrum antibiotic and wait to see how the patient responds." When signs of infection continued, Dr. Lachs opines that Dr. Nesa appropriately ordered a wound culture on June 5 and started the patient on additional "stronger" IV antibiotics, meropenem and vancomycin. The wound culture ultimately returned positive for Enterococcus and Morganella, and the expert opines these IV antibiotics were the proper treatment for said bacterial infections. The expert further opines that an infectious disease consult was not required under the

10

[* 10]

standard of care, because Dr. Nesa was qualified as an internal medicine physician to determine the proper antibiotic course.

Additionally, the expert opines that the state of Decedent's arterial disease "would have prohibited any type of meaningful vascular intervention," and therefore the alleged "delay" in obtaining a vascular consult until June 8 was not a departure from the standard of care. He notes that the patient ultimately "agreed to see the vascular specialist for a second opinion" but he was consistently opposed to the idea of a leg amputation, which was the treatment the vascular specialist advised on June 8.

Finally, the expert opines that Dr. Nesa did not depart from the standard of care by not transferring the patient to a hospital for more aggressive treatment at any time during his admission. The expert places the onus on Decedent for steadfastly refusing transfer to a hospital for the purpose of amputation. Dr. Lachs opines that he was "promptly transferred to a hospital the second his condition warranted admission over any possible objection" on June 11. In the expert's opinion, he did not exhibit signs of septic shock (abnormal vital signs) warranting hospitalization until that point, and the expert opines that Dr. Nesa transferred him to Kings County Hospital at that time in accordance with the standard of care.

On the issue of proximate causation, Dr. Lachs opines that no alleged departures by Dr. Nesa were the cause of Decedent's inability to heal the pressure ulcer and the eventual amputation of his right leg below the knee. He opines that this outcome was an "unavoidable" result of Decedent's "significant preexisting medical conditions," because his vascular and arterial disease restricted the blood flow to his feet and prevented the existing unstageable pressure ulcer from healing.

Additionally, Dr. Nesa's vascular surgery expert Dr. Giangola opines that the patient's "preexisting vascular and arterial disease could not have been rectified or improved in a manner which would have prevented the ultimate below knee amputation." Based on the Kings County Hospital CT angiogram, the expert opines that his "significant occlusion and resultant limited blood flow into the foot" existed prior to his April 2016 admission to New York Congressional, and the deterioration of his wound and ultimate amputation was an inevitable outcome predating his treatment and care there. The expert opines that from a vascular standpoint, the

11

[* 11]

occlusion of blood flow in the patient's leg made amputation an unavoidable outcome and made the healing of the right heel ulcer impossible. Therefore, the expert opines that no treatment provided by Dr. Nesa between April and June 2016 caused or contributed to the Decedent's amputation.

Based on the submissions, Dr. Nesa's experts establish prima facie entitlement to summary judgment on the issue of whether Dr. Nesa complied with the standard of care with respect to her role in treating the patient's infection, implementing Dr. Mosad's wound treatment recommendations, ordering appropriate consultations, and ultimately transferring the patient to Kings County Hospital on June 11. The experts also set forth prima facie that the worsening of the ulcer and amputation of Decedent's leg were inevitable due to his vascular disease and no alternate treatment would have changed the outcome.

In opposition, Plaintiff submits the aforementioned expert affirmation from vascular surgeon Dr. Aranson, who also opines as to the claims against Dr. Nesa.

Dr. Aranson counters the opinions of Dr. Nesa's experts, opining that Dr. Nesa departed from the standard of care by failing to order a vascular consultation after her first examination of the patient on April 22, "to assess vascular sufficiency to the lower extremities following the finding of bilateral leg swelling." Dr. Aranson disputes the argument this consultation was never needed because the patient was resistant to surgery, stating that a vascular surgeon still could have recommended different treatment options and assessed his medications, and therefore the patient's refusal to consider amputation (which continued even after the vascular surgery consult was ordered on May 27 and after his June 8 appointment) was no reason to delay this referral until late May/early June.

Dr. Aranson also opines that Dr. Nesa departed from the standard of care in treating the infection of Decedent's right heel pressure ulcer. He opines that Dr. Nesa, like Dr. Mosad, failed to timely culture the wound, identify the bacteria, and prescribe appropriate antibiotics when she saw the patient on May 17, 2016, despite Decedent's elevated fever and other signs the wound was infected. He counters the opinion of Dr. Nesa's expert that it was acceptable to start with broad spectrum antibiotics before the stronger IV medications

12

[* 12]

and wound culture on June 5, opining that Decedent was not given proper medication for Morganella bacteria for 18 days, constituting a departure from the standard of care which allowed the infection to worsen.

Finally, Dr Aranson opines that as the primary physician directing Decedent's care throughout his admission, Dr. Nesa should have transferred Decedent to a hospital sooner, opining that the patient required "a higher level of care" and his condition warranted "hospitalization to aggressively treat the wound" as early as May 13. He opines that it was a departure from the standard of care to delay transfer until Decedent's condition required emergency intervention on June 11.

Dr. Aranson's opinions on proximate causation were previously addressed with respect to Dr. Mosad. He opines that the failure to transfer the patient to a hospital led to the worsening of the right heel ulcer and allowed it to become infected and gangrenous, and further opines that the lack of proper treatment of the infection proximately caused the Decedent's injuries. Dr. Aranson also counters the opinion of the movant's expert that amputation was unavoidable from the start of his admission at New York Congregational, due to his impaired arterial condition as it appeared on the June 2016 CT angiogram following his transfer to the hospital. The expert opines that the delay in transferring the patient to a hospital or requesting a vascular specialist sooner than June 8 (by which point the vascular surgeon advised that amputation was inevitable) deprived Decedent of the chance to salvage the leg.

Plaintiffs have raised triable issues of fact that preclude summary judgment in favor of Dr. Nesa. The experts offer conflicting opinions on whether Dr. Nesa complied with the standard of care, including the timeliness of Decedent's IV antibiotics, vascular consult, and transfer to the hospital. They also raise issues of fact on whether these alleged departures were the proximate cause of a deterioration of the ulcer, infection, and/or the amputation. Accordingly, Dr. Nesa's motion for summary judgment is **denied.**

It is hereby:

**ORDERED** that Defendants' Safwat F. Mosad, M.D. and Safwat F. Mosad, M.D. P.C.'s motion (Seq. No. 8) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all

13

[* 13]

causes of action against them, or in the alternative, granting partial summary judgment on any claim or theory of liability, is **DENIED;** and it is further

ORDERED that Defendant Mushammat J. Nesa, M.D.'s motion (Seq. No. 9) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor, is **DENIED.**

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

14

[* 14]